UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOSEPH L. NALLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:11-0610 |
| ) | Judge Sharp |
| PATRICK R. DONAHOE, Postmaster ) | |
| General, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This is an action under the Rehabilitation Act brought by Joseph L. Nalley, an employee of the United States Postal Service ("USPS") presently on unpaid leave. Pending before the Court is the fully-briefed Motion for Summary Judgment (Docket No. 33) filed by Defendant Patrick R. Donahoe, Postmaster General. For the reasons that follow, that Motion will be denied.

**I.**

In support of its Motion for Summary Judgment, Defendant has submitted a 248- paragraph, 70-page Statement of Undisputed Facts (Docket No. 37). Plaintiff has responded to those statements (Docket No. 47), to which the Government has replied (Docket No. 54). Plaintiff has also provided his own 34- paragraph Statement of Material Facts (Docket No. 46), to which the Government has responded (Docket No. 53).

One might think that with 282 paragraphs of facts, there must be a genuine dispute somewhere so as to preclude summary judgment. That might be so in some cases, but this is not a case requiring the presentation of hundreds of supposed facts. The Court's concern on a motion for summary judgment is determining whether there is a genuine issue of *material* fact requiring a trial.

1

Here, rather than focusing on the material facts, the parties seemingly try to summarize what the discovery record has revealed. Many of the tendered facts are simply not material and many are not "facts" at all. Particularly worthy of note on this score are the parties' repeated quotations of deposition testimony to the effect of so-and-so said this or that. The fact that a deponent may have said something does not necessarily make that something a fact.

Given the approach the parties have taken, this Court is unable to decide whether the Government is entitled to judgment as a matter of law, although it sure seems that might be the case. This is not for lack of trying. The Court has expended considerable time and effort on this file. When all is said and done, however, no clear picture emerges as to whether Plaintiff could have performed his work as a mail handler with a reasonable accommodation, or whether he was retaliated against for seeking an accommodation.

## II.

Plaintiff began his employment as a mail handler with the United States Postal Service ("USPS") in July 1996. Since 2003, he has been assigned to the 010 section the Nashville Processing and Distribution Center ("Nashville P&DC"). In that section, mail handlers separate and distribute the mail for other areas of the plant and letter cancellation, both manually and by loading and unloading machines. There are three tours or shifts, and Plaintiff worked Tour 3, which meant that he worked either from 2:00 p.m. to 10:30 p.m., or from 3:00 p.m. to 11:30 p.m.

In January 2009, Plaintiff was promoted to a level-five mail handler, and in that role was assigned to work on the Advanced Facer Cancelling System ("AFCS") machine. There are seven AFCS machines at the Nashville P&DC and nine mail handlers on Tour 3. The two handlers with the lowest seniority act as relief operators (or junior operators), rotating among the seven machines

and filling in for the more senior operators when they have breaks or are otherwise away from the machines.

Plaintiff was a junior operator and, thus, the hours he worked on the AFCS machine were spent relieving one of the senior operators. In his deposition, Plaintiff testified that a level-five mail handler generally spends six hours of an eight hour shift working on the AFCS machine. He also testified, however, that a relief operator normally spends approximately two hours of an eight hour shift on that machine.[1]

When not working the AFCS machine, a junior operator performs other mail handler duties within the 010 operation, at least until the stamped mail for that day has been run.[2] A mail handler may operate the NEC machine that runs stamped mail that has been refaced. The mail handler can also perform "rob-up collection," that is, retrieve the mail from inside the post office or outside from the mail boxes, place the mail in hampers, and bring it into the workroom. Additionally, the mail handler can work on the cull belt, removing mail that will not run through the AFCS machine, placing that mail in trays, and carrying the trays (weighing 10 to 25 pounds) to another location.

A mail handler in the 010 section may also be assigned to work on the hand stamp belt where the handler retrieves bulky items from the conveyor belt, hand stamps it, throws it into a bin or tray and carries that mail to another area of the floor. Although the hand stamp belt can run continuously through the night, it stops when there is nothing to stamp, and the handler moves elsewhere.

---

[1] Kerry Scates, the branch president of Plaintiff's union and himself a mail handler on Tour 3, estimated that Plaintiff averaged three to four hours a day on the AFCS machine during the relevant period.

[2] The goal for the Nashville P&DC was for mail to clear the AFCS machines by 9:30 p.m. and clear the 010 area by 10:00 p.m.

Still another job for a mail handler is working the rough cull dumper. In that job, the handler pushes a hamper (which is either plastic or metal with a plastic insert) into position and turns a lever that dumps the mail onto the conveyor bet. Additionally, a mail handler might be called upon to work on the cull belt doing Netflix separation, that is, pulling Netflix DVDs and placing them into trays, that, when full, can weigh 25 pounds.

Also on the work floor is the torn mail table (also called the flipping table and the sit down table). In this position the handler sits at a table and tapes up or bags damaged mail. Most of this work is done by employees who are on limited duty.

Finally, a mail handler can be sent to work out-of-section for approximately two hours per day. Such work can entail going to work on the docks to load and unload trucks, or to work in the green room. In the green room, mail that has been collected at all the stations is placed into containers to be sent on to the next destination.

The USPS is unionized and its mail handlers are represented by the National Postal Mail Handler's Union. Through its National Agreements with the various postal unions, the USPS has, at times, contractually obligated itself to employment policies or procedures that go beyond that required under federal law, including the Rehabilitation Act.

The USPS has different policies for employees who are injured on the job, as opposed to those who are injured off the job. When a postal employee is injured on the job, as determined by the Office of Workers' Compensation Programs ("OWCP"), the USPS places the employee on a "limited duty" assignment and is obligated to find work for that employee, even if the work is essentially non-productive or a "make work" job. When a postal employee suffers an off-the-job injury and cannot perform the functions of his or her position, the employee can request a "light

duty" assignment consistent with his or her medical restrictions. Under the provisions in the National Agreement with the mail handlers, the USPS cannot look for a light duty assignment outside the employee's existing craft.[3] A request for light duty is made by the employee in writing and forwarded to the plant manager who either approves or disapproves the request. As between the two, a limited duty employee has priority in work assignments over a light duty employee.

In March 2009, James Drummer became the plant manager of the Nashville P&DC. Shortly after taking the reins, Drummer informed his managers that due to low mail volume and the high number of "limited duty"employees who had taken over all the sedentary work, light duty positions were no longer available.

Plaintiff has had three hip replacements (in March 2006, April 2006, and February 2007) and it would be an understatement to say that he has had numerous medical problems and seen many doctors related to his hips and back. It would also be an understatement to say that the USPS has favorably responded to various doctors' notes and, at times, tried to accommodate Plaintiff's limitations, such as reducing the load he was required to lift to no more than 25 pounds, or limiting the time he was required to stand.[4] This case, however, centers on Plaintiff's requests for assignments within his medical restrictions in May 2009 and September 2010.

After missing the last step of a ladder in his garage, Plaintiff was given a doctor's statement indicating that he was to be off work from April 1 to April 24, 2009, which was later updated to include the following week until May 1, 2009. The note extending the leave was dated April 24,

---

[3] Thus, for example, the USPS cannot provide a mail handler with a clerk or carrier position as a light duty accommodation.

[4] The maximum lifting requirement for a mail handler is 70 pounds. The standing requirements are 8 hours per day.

2009, and forwarded by Plaintiff to his supervisor, Steve Chavez, with the explanation that Plaintiff was to start physical therapy soon and that he did not know when he could return to work.  On May 1, 2009, Plaintiff gave Chavez a Work Release Form signed by Dr. Michael Christie that restricted Plaintiff to sitting only.  Plaintiff claims that Chavez allowed him to perform tasks at the torn mail table that enabled him to sit down, although he was to do so out of the sight of higher ups, including Drummer, the Plant Manager.  Plaintiff was told by Chavez that he and his doctor needed to fill out a Form CA-17, Duty Status Report, and that the report had to state that the injury was work-related in order for Plaintiff to receive a limited duty assignment.

On May 5, 2009, Plaintiff submitted a CA-17 form signed by Dr. Christie that indicated that Plaintiff was restricted to lifting 15 pounds, standing and walking one hour per day, and could not climb, kneel, bend/stoop, twist or pull/push.  The form, however, did not state that the injury was work-related.  On the day he submitted the form, Plaintiff worked 2 hours and then left to go to the emergency room where he was given pain medication and referred to Dr. Wesley Coker, an orthopaedic surgeon.  Plaintiff did not thereafter work again until July 3, 2009, when he worked at the torn mail table until he ran out of mail and had to clock out.

At some point between his two work appearances on May 5, 2009, and July 3, 2009, Plaintiff requested a light duty assignment.  He claims he did so because management would not recognize the CA-17 form without the indication that the injury was work related, the only way he would be allowed to work would be to request light duty, and union president Scates advised him to apply for light duty.  In support of the request, Plaintiff submitted a Work Restriction Evaluation signed by Dr. Christie on May 18, 2009, that allowed for continuous sitting, one hour per day walking, one hour per day standing, lifting no more than 10-20 pounds, and no bending, squatting, climbing,

6

kneeling, or twisting.[5]  His request for light duty was denied by Drummer who did not look at any forms in making the decisions, but relied upon what Chavez told him.

Plaintiff concedes that with the restrictions imposed by Dr. Christie, he could not have run the NEC machine, do rob-up collections, run the rough cull dumper, work the culling belt, do Netflix separations, or any of the out-of-section jobs, including working in the green room.  He claims, however, that he could have run the AFCS machine for one relief (two fifteen minute breaks), worked the torn mail or flipping table, and perhaps the hand stamp table.

On July 9, 2009, Plaintiff submitted another Work Release Form signed by Dr. Christie, that called for no lifting of over 25 pounds, limited standing/walking to two to four hours per day the first week (but allowing increases as the weeks progressed), and required rest periods every two hours that decreased over time.  With these restrictions, Plaintiff returned to work part-time on the cull belt for a couple of weeks and then full-time on July 27, 2009.  Though still limited to a lifting restriction of 25 pounds, Plaintiff worked full duty the rest of 2009.

Calendar year 2010 was not a banner year for Plaintiff at work.  After taking a lot of sick and annual leave during January and February to attend to matters relating to deaths in his family, Plaintiff returned to work and allegedly injured his back on March 24, 2010, approximately 20-25 minutes after being sent to the green room. That same day, an emergency room physician filled out a Duty Status Report stating that plaintiff could stand four hours per day, but restricted his lifting, bending, pulling, and pushing.  Thereafter, Plaintiff visited different specialists in April 2010, who issued return-to-work forms with differing restrictions.  Plaintiff also applied for workers'

---

[5] Plaintiff submitted another evaluation dated the next day which completed some of the fields left blank in the previous form, but called for the same restrictions.

compensation benefits, but was denied.

Plaintiff was off work on Family and Medical Leave Act leave from June 16 to July 6, 2010, during which time he had knee surgery. He was released to work on July 7, 2010, by Dr. Norman Simx, with a lifting restriction of no more than 20 pounds and the recommendation that he not push any heavy equipment.

Ed Shear who became the acting manager of distribution operations in December 2009 for Tour 3 had concerns about Plaintiff's ability to do his work and "several times" contemplated sending Plaintiff for a fitness-for-duty ("FFD") examination. Shear was suspicious about whether Plaintiff actually injured himself in the green room, a suspicion that was heightened because Plaintiff had stated that he had enough seniority to not be sent out-of-section, and the next time he was directed to go to the green room, Plaintiff refused, claimed he was sick, and left. Shear opined that Plaintiff "does not seem to have issues until he is sent out of his assigned to area to assist in other areas." In an August 18, 2010 email sent to the Office of Inspector General ("OIG"), Shear stated that "a complete investigation of this employee would be in the best interest of the Postal Service." (Docket No. 40-36).

In August 2010, Shear was informed by OWCP that if Plaintiff was claiming restrictions on his ability to work, Plaintiff needed to request light duty because he did not have an open claim with OWCP and any injuries were not work related. Shear gave Plaintiff a Request for Light Duty form and instructed him to complete and return it by September 1, 2010. Plaintiff refused, insisting that his situation called for limited (not light) duty since he allegedly was injured on the job. Plaintiff was informed that if he wanted to continue working, the paperwork needed to be completed.

Plaintiff showed up for work sans paperwork on September 2, 2010, and was told he could

8

not clock in until the paperwork had been submitted. Plaintiff then informed Scates that he was leaving and requesting sick leave. Thereafter, Shear sent an email to Connie King, the occupational health nurse for USPS's Tennessee District, recounting the events, recommending a fitness-for duty examination ("FFD"), and concluding that Plaintiff was continuing to hunt for doctors who would give him the restrictions he requested.

On November 1, 2010, Plaintiff was seen by Dr. A. S. Callahan, III, at the Stroke & Heart Attack Prevention Center in Nashville, who recommended that Plaintiff apply for disability, although Plaintiff claims that Dr. Robert LaGrone of the Center for Inflammatory Diseases was of the opinion that Plaintiff could continue working. Regardless, Dr. LaGrone reported that Plaintiff was totally unable to work from September 2, 2010, to November 11, 2010.

Once Plaintiff's FMLA leave ran out, Plaintiff applied for temporary light duty. Accompanying that request was a Medical Status Report releasing Plaintiff to restricted duty from November 12, 2010 to December 20, 2010. Plaintiff was restricted to continuous lifting of no more than 10 pounds; four hours of intermittent lifting of 10-20 pounds per day; intermittent standing, walking climbing, bending; stooping and kneeling of from 1 to 2 hours each day; and no pushing/pulling. Plaintiff claims that with those restrictions he could do his job at the AFCS machine for two hours per day, and would then have to do some job that allowed sitting. He concedes that he could not do the NEC machine, rob-up collections, rough cull dumper, the culling belt, the tray line, Netflix separation, or any out-of-area standing work.

On November 12, 2010, Drummer denied Plaintiff's request for temporary light duty, checking the box stating that temporary light duty was not available within the restrictions set forth

9

by the attending physician.[6] This was followed by a letter to Plaintiff dated November 24, 2010, from Lisa Lukacic of USPS Human Resources, informing him of the denial and telling him that if wanted to request reasonable accommodations, he should send a request and supporting documentation to the District Reasonable Accommodation Committee ("DRAC").

Plaintiff completed the appropriate paperwork in December 2010 and the DRAC met on January 25, 2011. Although Defendant has submitted over 240 paragraphs of facts, only six of them discuss the DRAC meeting, doing so in the most conclusory of ways. It relies primarily upon the deposition testimony of two members of the committee – King, the nurse, and Ruth Bland, the Manager of Health and Resource Management at the Nashville PD&C – for the general proposition that the committee tries to determine if an employee is disabled and if so whether they can be accommodated, and that it was determined there was no accommodations that would allow Plaintiff to work as a mail handler given his restrictions. However, those same individuals were far from clear as to what accommodations were requested, such as whether Plaintiff wanted to be able to use a stool, whether the trays of mail could be adjusted to weight 10 pounds or less, or whether Plaintiff's primary objection was to working in the green room.

The Court has independently reviewed the DRAC file, and finds it unenlightening. It consists primarily of medical status reports, exchanges of letters, and forms requesting light duty. An initial denial letter dated February 8, 2011, states that "it was determined that you do not have a physical or mental impairment which substantially impacts a major life activity," and "[o]nly such impairments entitle employees to the protection of the Rehabilitation Act and possible

---

[6] According to Drummer, the only work Plaintiff was capable of performing at that time was working at the torn mail table. However, there were already employees on limited duty working there, doing mostly unproductive work throughout the day, and adding Plaintiff would only increase inefficiency. Moreover, the torn mail table is not a permanent job.

accommodation under that Act." (Docket No. 49-7 at 31). An April 13, 2011 letter changes course, stating that "you may have a physical or mental impairment which substantially impacts a major life activity; however, unfortunately, no reasonable accommodations were identified which would enable you to perform the essential functions of your present position," and that "the Committee was unable to identify any other vacant, funded positions in your commuting area, the essential functions of which you could perform with or without reasonable accommodation." (Id. at 29). Both letters could not have been more *pro forma*.

After the DRAC's decision, Plaintiff made other requests for limited or light duty with no success. At least two of his doctors apparently believe that he is now disabled (or at least should apply for disability benefits), but Plaintiff insists that since he was released to return to work on November 12, 2010, he could work the AFCS machine for two hours per day and spend the remainder of a day in a sit down job.

## III.

Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794. Where, as here, there is no direct evidence of discrimination, the Court applies the familiar three-step McDonnell Douglas[7] framework in assessing a Rehabilitation Act claim. See Gribcheck v. Runyon, 245 F.3d 547, 550 (6th Cir. 2001). Under that framework, Plaintiff must first set forth evidence from which a reasonable jury could conclude a *prima facie* case of discrimination has been established.

---

[7] McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).

11

Macy v. Hopkins Cnty. School Bd. of Educ., 484 F.3d 357, 364 (6th Cir. 2007). If Plaintiff does so, the burden then shifts to Defendant to articulate some "legitimate, nondiscriminatory reason" for its actions. Id. If Defendant does so, the burden then shifts back to Plaintiff to identify evidence from which a jury "could conclude that the proffered reason is actually a pretext for unlawful discrimination." Id.

## A.

Turning first to the disability discrimination claim, to establish a *prima facie* case, Plaintiff "must show (1) that he is disabled; (2) that he was otherwise qualified for the position; (3) that he was excluded solely by reason of his disability; (4) and that the relevant program is receiving federal financial assistance." Doe v. Salvation Army in U.S., 685 F.3d 564, 567 (6th Cir. 2012). Establishing a *prima facie* case is not an onerous burden and, "at the summary judgment stage, a plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." Macy, 484 F.3d at 364-65.

Here, the first and last elements are not disputed. As for Plaintiff's contention that he was otherwise qualified to work as a mail handler and was excluded from doing so because of his limitations, Defendant points out that Plaintiff admittedly could not stand for more than two hours each day and was limited in the amount he could carry.

To be sure, such limitations made Plaintiff unable to do many (if not most) of the functions performed by a mail handler, including apparently, things like working the cull belt and the NEC machine, and doing rob-up collections, at least without some sort of an accommodation. However,

12

under the Rehabilitation Act, as with the Americans With Disabilities Act ("ADA"),[8] "[o]ne form of discrimination occurs when an employer fails to make 'reasonable accommodations' to an employee's known disability, unless those accommodations would cause 'undue hardship' to the employer." Jakubowski v. Christ Hosp., Inc., 627 F.3d 195, 201 (6th Cir. 2010). This envisions an "interactive process" in which "'both parties have a duty to participate in good faith,'" and '[t]he purpose" of which "is to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" Rorrer v. City of Stow, 743 F.3d 1025, 1040 (6th Cir. 2014) (quoting Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 871 (6th Cir. 2007)).

As best as the Court can tell from this record, after Plaintiff initially returned to work for the brief stint in May 2009 with his lifting and standing restrictions, the USPS undertook nothing that resembled a good-faith exploration of Plaintiff's ability to perform his job with some sort of reasonable accommodation, but instead mandated that he apply for light duty. It is also far from clear whether the DRAC in January 2010 actually considered potential reasonable accommodations. Perhaps the USPS's position then was as it is now: Plaintiff was not "otherwise qualified" because he cannot establish that he could perform the "essential functions" of his mail job either with or without a reasonable accommodation.

Defendant argues that "[t]he best evidence of Plaintiff's core functions is how he describes his typical routine duties, all of which required more than 2 hours of standing." (Docket No. 52 at 3). Actually, however, the concern is with essential functions and there are more accurate

---

[8] "By statute, ADA standards govern Rehabilitation Act claims of employment discrimination." Holiday v. City of Chattanooga, 206 F.3d 637, 642 n.1 (6th Cir. 2000) (citing 29 U.S.C. § 794(d)).

13

barometers than Plaintiff's recollections. Defendant recognizes as much by asserting that a "job function is essential if its removal would 'fundamentally alter' the position," and that "[t]o determine whether a particular function is 'essential' courts consider the following list of non-exhaustive factors: (i) the employer's judgment as to which functions are essential; (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) the terms of a collective bargaining agreement; (vi) the work experience of past incumbents in the job; and/or (vii) the current work experience of incumbents in similar jobs." Id. (citing Hoskins v. Oakland County Sheriff's Dep't, 227 F.3d 719, 726 (6th Cir. 2000)). Unfortunately, Defendant does not enlighten the Court as to what an examination of those factors would show.

True, Drummer testified in his deposition that, based upon his 25 years of experience, he was of the opinion that the weight of the trays in the 010 section could not be lowered because it would slow down operations and make the employee less efficient. There is also evidence that the provisions in the mail handlers' National Agreement allow limited duty only for employees injured on the job and preclude light duty assignments outside of the employee's existing craft. What is absent, however, is a clear answer as to whether a reasonable accommodation could be made consistent with Plaintiff's restrictions. In this regard, the Court cannot say as a matter of fact that each and every relief operator must work each of the various positions daily, whether (consistent with the National Agreement and whatever seniority rights exist) some employees can be assigned to do certain tasks while others do not, whether some of the operations that are traditionally performed standing up can be performed sitting down, and host of other questions. The DRAC file

contains a "Job Analysis – Mail Processing Clerk," but this does not answer many of these questions because it speaks about the myriad duties that are performed on a "rotation basis," but does not say that that the rotations cannot be changed if necessary, especially when there may be a need for a reasonable accommodation.[9]

None of this is to say that to accommodate Plaintiff the USPS was required to create what would in effect be a new job, or that it was required to allow Plaintiff to assume limited duties in a "make work" job. Indeed, the law is to the contrary. See Burns v. Coca–Cola Enters., Inc., 222 F.3d 247, 257 (6th Cir. 2000) ("Employers are not required to create new jobs, displace existing employees from their positions, or violate other employees' rights under a collective bargaining agreement or other non-discriminatory [company] policy."). But the law does require "restructuring of non-essential duties as a reasonable accommodation in appropriate circumstances." Henschel v. Clare Cnty. Rd Comm'n, 737 F.3d 1017, 1024 (6th Cir. 2013).

The employer has the burden of proving that a challenged job criterion is essential or that a proposed accommodation will impose an undue hardship, E.E.O.C. v. Ford Motor Co. 2014 WL 1584674, at *5 (6th Cir. April 22, 2014), and the USPS has made that showing niether as a matter of law nor fact.[10] As a consequence, the Court cannot say that the USPS's stated reason for not

---

[9] With regard to Plaintiff's specific limitations, the Job Analysis indicates that standing is performed on a constant basis when the handler is processing mail on automated equipment, but only on an occasional basis if processing is by manual methods, and that the exact opposite is true with respect to sitting. The analysis also indicates that lifting of 10 pounds or less is performed on a constant basis while lifting mail trays that weigh from 10 to 35 pounds is performed on a frequent basis.

[10] In its reply brief, Defendant notes that "'in unpublished cases, the Sixth Circuit has indicated that an employer only violates the interactive process requirement if the employee can demonstrate that he or she could have been reasonably accommodated but for the employer's lack of good faith.' Denczak v. Ford Motor Co., 215 F. App'x 442, 445-46 (6th Cir. 2007)." (Docket No. 52 at 5). The theory underlying such holdings appears to be that an employer should not be liable when there is no possible way to accommodate an employee's limitations, or be required to engaged in what amounts to futile investigations. See Moses v. American Nonwovens, Inc., 97 F.3d 446, 448 (11th Cir. 1996). But Plaintiff has raised the possibility that

15

allowing Plaintiff to work was the real reason or was instead a pretext to effectively terminate Plaintiff.

Although the Court will deny summary judgment on Plaintiff's disability discrimination claim, it does so fully recognizing that the weight of the evidence appears to favor Defendant's position that Plaintiff's significant limitations made it impossible to perform his duties as a mail handler, even with reasonable accommodations. The Court's task, however, is not to weigh the evidence – that task is for the jury.

**B.**

As with the disability discrimination claim, the Court utilizes the McDonnell Douglas three-step burden-shifting framework for analyzing claims of retaliation, with the initial burden on Plaintiff to establish a *prima facie* case. Gribcheck, 245 F.3d at 550. "A prima facie case of retaliation has four elements: 1) the plaintiff engaged in legally protected activity; 2) the defendant knew about the plaintiff's exercise of this right; 3) the defendant then took an employment action adverse to the plaintiff; and 4) the protected activity and the adverse employment action are causally connected." Id.

Insofar as Plaintiff's claim is based upon his contention that he was denied a reasonable accommodation in retaliation for having filed EEO complaints in January 2007 and December 2008, this claim to fails at the *prima facie* stage. The decisionmakers, Drummer (who did not become plant manager until March 2009), and Shear (who did not became the acting manager of distribution

---

he could be reasonably accommodated by letting him work relief on the AFCS machine and allowing him to perform some sort of sit-down job for the remainder of his shift. While Defendant insists that standing for more than two hours per day and continuously lifting more than 10 pounds are essential parts of the mail handler's job, "the determination of what responsibilities are essential functions is 'typically a question of fact and thus not suitable for resolution through a motion for judgment as matter of law.'" Henschel, 737 F.3d 1017 at 1022.

operations until December 2009) both attest that they were unaware of Plaintiff's prior EEO complaints. Plaintiff has proffered no evidence to rebut those assertions other than point to the August 18, 2010 email Shear wrote to the Office of Inspector General. In that email, however, all Shear actually says is that he was being accused by Plaintiff of seeking an investigation because Plaintiff had previously filed an EEO complaint, even though Shear had been unaware of that fact until Plaintiff made the acccusation. Even assuming that this shows that Shear knew about the prior exercise of Plaintiff's right, it does not suggest any causal connection. While Plaintiff generally cites cases for the proposition that temporal proximity can establish a causal connection, that proximity is generally limited to six months, and certainly does not extend to actions which happen more than a year and half after the exercise of protected activity. See Nicholson v. City of Clarksville, 530 F. App'x 434, 448 (6th Cir. 2013) ("A time period greater than six months, without more, is not a sufficiently short period of time to satisfy the causal connection element of a retaliation claim"); Jones v. City of Franklin, 468 F. App'x 557, 564 (6th Cir. 2012) ("Temporary proximity may, in rare cases, be enough to establish a causal connection at the prima facie stage . . . but in those cases 'the time has usually been limited to less than six months'") (citation omitted) ; Cecil v. Louisville Water Co., 301 F. App'x 490, 502 (6th Cir. 2008) ("lengthy gaps" of ten and seventeen months between protected activity and adverse action "are insufficient, on their own, to create a reasonable inference of causation").

Regardless, Plaintiff also claims that he was retaliated against because when he sought a reasonable accommodation, Shear requested an OIG investigation and recommended a fitness for duty exam. Defendant argues this claim fails because Shear's actions were "not 'materially adverse' as envisioned by the Supreme Court in Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S.

53 (2006)." (Docket No. 52 at 7).

Burlington holds that for purposes of a retaliation claim, a plaintiff must show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 57. The requirement that the action would dissuade a reasonable employee from complaining is meant "to separate significant from trivial harms" and "those petty slights or minor annoyances that often take place at work and that all employees experience." Id. at 68. "In analyzing the significance of any given act of retaliation, '[c]ontext matters [and] [a]n act that would be immaterial in some situations is material in others.'" Laster v. City of Kalamazoo, 746 F.3d 714, 731 -32 (6th Cir. 2014) (quoting Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998)).

Because "context matters," whether an action is materially adverse can present a question of fact. See Oncale, 523 U.S. at 81 ("Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances'"); Crawford v. Carroll, 529 F.3d 961, 973 n.13 (11th Cir. 2008) ("Burlington also strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions."); McArdle v. Dell Products, L.P., 293 F. App'x 331, 337 (5th Cir. 2008) ("Whether a reasonable employee would view the challenged action as materially adverse involves questions of fact generally left for a jury to decide"). The Court cannot say as a matter of law that Shear's request for an investigation by the OIG was not a materially adverse action. Compare Arnold v. City of

18

Columbus, 515 F. App'x 524, 537 (6th Cir. 2013) ("Plaintiffs have arguably demonstrated a number of adverse employment actions, including the investigations" and calls for investigation); Szeinbach v. Ohio State Univ., 493 F. App'x 690, 693 (6th Cir. 2012) (a "not run-of-the-mill internal investigation" could be an adverse employment action) with Ellis v. Shelby Cnty. Land Bank Dept., 548 F. App'x 320, 332 (6th Cir. 2013) (although stating that it "need not resolve the appeal on this ground," Sixth Circuit observed that "[a]n investigation by itself, as opposed to the results of an investigation, does not sound like an adverse employment action"); Russell v. Ohio Dept. of Admin. Servs., 302 F. App'x 386, 393 (6th Cir. Dec. 3, 2008) ("[c]onducting an investigation and issuing a report . . . in not an adverse action" at least where the report is favorable to plaintiff). The Court finds it necessary for the jury to make this determination, as well as the determination of whether Shear sought an investigation in retaliation for Plaintiff's request for accommodation or because he thought Plaintiff was being recalcitrant and trying to game the system.

**IV.**

On the basis of the foregoing, Defendant's Motion for Summary Judgment will be denied and this case will be set for trial.

An appropriate Order will be entered.

                                                                      _/s/ Kevin H. Sharp_
                                                                      KEVIN H. SHARP
                                                                      UNITED STATES DISTRICT JUDGE

.